UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

|  |  |
|---|---|
| LINDSAY HELD, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| -against- |  |
| PERFORMANCE SPORTS GROUP LTD. and PERFORMANCE LACROSSE GROUP, INC., | JURY TRIAL DEMANDED |
| Defendants. |  |

---

Plaintiff, Lindsay Held ("Held"), by and through his counsel, Denlea & Carton LLP,
respectfully files this Class Action Complaint on behalf of himself and a class of similarly-
situated individuals who have purchased Cascade R lacrosse helmets manufactured and/or
marketed by Defendants Performance Sports Group Ltd. and Performance Lacrosse Group, Inc.
(collectively, "Performance"), and alleges as follows:

## PARTIES

1.     Plaintiff Lindsay Held is a natural person of full age of majority who is
domiciled and resides in Ridgefield, Connecticut, which is located in Fairfield County.  On or
about June 25, 2014, Plaintiff purchased a Cascade R lacrosse helmet with a chrome mask
manufactured, marketed, and distributed by Defendants, at Lacrosse Unlimited in Danbury,
Connecticut.   Plaintiff paid $259.99 plus applicable sales tax, and was damaged thereby.

2.     Performance Sports Group Ltd. is a corporation organized and existing under
the laws of the Province of British Columbia, Canada.  Performance Sports Group has its

principal place of business located at 100 Domain Drive, Exeter, New Hampshire.
Performance Sports Group is a holding company which conducts all its operations through its
wholly-owned and indirectly-owned subsidiaries, including Performance Lacrosse Group,
Inc.  Performance Sports Group claims to be a leading developer and manufacturer of high
performance sports equipment and related apparel.

      3.      In 2010, Performance Sports Group acquired lacrosse equipment maker
Maverik.  In 2012, Performance Sports Group acquired lacrosse helmet maker Cascade.
Performance Sports Group's lacrosse product operations and activities are run by
Performance Lacrosse Group, Inc.

      4.      Performance Lacrosse Group, Inc. is a wholly-owned subsidiary of
Performance Sports Group.  Performance Lacrosse Group, Inc. has its principal place of
business located at 100 Domain Drive, Exeter, New Hampshire.

      5.      Cascade Lacrosse operates as part of Performance Lacrosse Group, Inc.
Cascade Lacrosse, among other things, manufactures, distributes, and sells lacrosse helmets,
including the Cascade R lacrosse helmets.

      6.      According to its November 2014 Investor Presentation, Performance Sports
Group believes that the U.S. and Canadian market for lacrosse equipment in 2013 amounted
to $120 million in revenues, and Performance Sports Group believes that its Cascade and
Maverik lacrosse equipment product sales constitute approximately a 26% market share.
More importantly, Performance Sports Group believes that its lacrosse helmet products hold
an approximately 85% market share.

7.     Performance's virtual "lockhold" on the lacrosse helmet market in the United States and Canada comes from sales and distribution of its Cascade lacrosse helmet products.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Jurisdiction is proper because (1) the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs and (2) the named Plaintiff and the Defendants are citizens of different states. 28 U.S.C. §1332(d)(2)(A).

9.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claim occurred within this judicial district, Defendants have marketed and sold the products at issue in this action within this judicial district,  and Defendants have conducted business within this judicial district.

## CHOICE OF LAW

10.     Connecticut law governs the state law claims asserted herein by Plaintiff and the class members.

11.     In this action, Plaintiff and the Class seek recovery for economic damages only, and expressly exclude any claims for personal injury, which, if they exist, are expressly excluded from this action.

12.     Defendants' acts and omissions described herein were implemented in the State of Connecticut through Defendants' marketing and sales of their products within the State of Connecticut.

13.     Connecticut has a substantial interest in protecting the rights and interests of

3

Connecticut residents and others who purchase goods in Connecticut against wrongdoing by companies which market and distribute their products within the State of Connecticut, which interest is greater than that of any other State or country.

## GENERAL ALLEGATIONS

14.     Lacrosse is a very popular and growing sport in the United States and Canada. According to the New York Times, lacrosse is among the nation's fastest-growing youth sports, especially among boys whose parents are looking for a safer alternative to football. In the 2013-2014 academic year, 188,689 boys and girls played lacrosse at the high school level, according to the National Federation of State High School Associations.

15.     Lacrosse is an aggressive contact sport, and players wear protective gear, including, most importantly, helmets. Similar to football players, lacrosse players wear helmets to reduce the number of skull fractures and other head injuries.

16.     Improvements to sports helmets intensified in the 1960s when helmet makers improved their football helmets to reduce the number of skull fractures. In 1969, a year after 32 deaths were reported from head and neck injuries directly due to participation in organized football games, the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") was established in order to find ways to reduce injuries. Football helmets were targeted for the initial research effort, and the NOCSAE eventually developed manufacturing standards for football helmets, and later, for lacrosse helmets.

17.     NOCSAE is an independent and non-profit standards development body with its sole mission to enhance athletic safety through funding scientific research and by developing and maintaining performance standards for protective equipment. NOCSAE

4

directors represent all interests that would be materially affected by its standards, including coaches, certified athletic trainers, team physicians, equipment managers, orthopaedic and neurological sports medicine physicians, helmet reconditioners, and manufacturers.

18.     NOCSAE developed and has maintained a lacrosse helmet performance standard for many years. In order to meet the standard, a lacrosse helmet must meet rigorous impact tests specifically set forth in ND041. In addition, the certification of an entire model population must be premised upon an effective and properly applied quality control and quality assurance program that includes testing a statistically large enough sample of randomly selected helmets and providing a method to analyze the sample test data to prove that all helmets in the model population would meet the standard if tested.

19.     *NOCSAE does not approve or certify equipment. But NOCSAE does take action when it determines that equipment does not in fact meet the NOCSAE standards as certified by the manufacturer.* Very importantly, the certification that a helmet meets the NOCSAE standard is made by the *manufacturer*. The words on the certification logo on the helmet state: "Manufacturer certifies MEETS NOCSAE STANDARD," followed by a clearly visible helmet logo. Permission to use NOCSAE trademarked phrases and logos on properly certified equipment is given to the manufacturer through a licensing agreement that obligates the manufacturer to comply fully with all applicable NOCSAE standards and to provide proof of proper certification when requested.

20.     A manufacturer that chooses to certify a helmet to the NOCSAE standard can only do so if it signs a license agreement, and agrees to comply with all requirements of the NOCSAE standards. These requirements include, but are not limited to:

5

- Creating and maintaining an effective quality assurance/quality control program;

- Conducting ongoing certification testing of sample sets representing production batches or lots;

- Developing supportive statistical and quantitative data from internal quality control testing of representative samples;

- Submitting samples of certified products annually to independent and qualified test laboratories for validation;

- Regularly reporting to NOCSAE any changes to models or the addition of new models being certified; and

- Keeping all certification test records and data and making that data available to NOCSAE when requested.

21.     Consumers and athletic organizations rely upon the NOCSAE certification when they buy helmets, and in particular, lacrosse helmets.

22.     Performance, through its Cascade Lacrosse operations, manufactures, distributes, and sells the leading brand of lacrosse helmets in the United States and Canada – the Cascade line of lacrosse helmets. The Cascade line of lacrosse helmets has secured an astounding 85% of the lacrosse helmet market.

23.     Performance markets its lacrosse helmets by prominently displaying the logo "Meets NOCSAE Standard" on all its Cascade lacrosse helmets, including specifically, all models of its Cascade R lacrosse helmets.

24.     The same representation is set forth on the www.cascadehelmets.com website

which Defendants maintain and utilize to market their goods. Each product webpage for the

Cascade line of lacrosse helmets prominently displays the logo "Meets NOCSAE Standard."

That website further touts Cascade's purported commitment to safety. The "Who We Are" tab

states: "We are American innovators with a passion to protect. We build & deliver high

performance game changing headgear. User-experience is how we measure ourselves."

     25.     Defendants further state, in the "Who We Are" tab:

> Because Bill's vision for Cascade has always been focused around the
> product, and Cascade strives to be on the leading edge of design and safety;
> we have and always will devote substantial resources to research and
> development. These resources come not only in the form of our top notch
> design team, but also in the NOCSAE test lab which we have on site in our
> Liverpool headquarters. The NOCSAE test facility allows us to ensure that all
> of our products meet and exceed the standards set by the agency charged with
> overseeing helmet design and safety standards.

     26.     Defendants' representations that their Cascade lacrosse helmets meet the

NOCSAE standard are absolutely critical to their ability to sell the Cascade lacrosse helmets.

Under NCAA, National Federation of State High School Associations, and U.S. Lacrosse

rules, helmets are required to meet the NOCSAE standard in order to be used in their

programs. Thus, no consumer would knowingly purchase a lacrosse helmet that does not meet

the NOCSAE standard.

     27.     On or about November 20, 2014, NOCSAE took the unprecedented step of

voiding the NOCSAE certifications of two leading lacrosse helmet models, the Cascade R and

the Warrior Regulator – after an independent investigation and evaluation revealed that those

products failed to meet NOCSAE standards. According to NOCSAE Executive Director and

General Counsel Mike Oliver, this is a first-of-its-kind but necessary decision.

     28.     On or about November 24, 2014, NOCSAE issued a press release announcing

that it has voided the manufacturers' NOCSAE certification for the Warrior Regulator and the

Cascade Model R lacrosse helmets.  The press release emphasizes:

> A product manufacturer certifies compliance with NOCSAE standards when it
> puts the NOCSAE name and logo on a helmet.  The certification tells the
> player, parent, coach and the governing bodies that the helmet has been
> subjected to all of the required testing, quality control and quality assurance
> obligations specified by the NOCSAE standard.  The manufacturer must
> confirm that its helmet meets the standard in all respects.
>
> The Warrior Regulator and the Cascade Model R had been certified by the
> manufacturers as compliant with the NOCSAE standard.  NOCSAE conducted
> an independent investigation and evaluation of the Warrior Regulator and the
> Cascade Model R, which included a review of each manufacturer's internal
> certification testing and quality control data.  NOCSAE also purchased these
> models independently through various retail sources and sent them to its
> contracted laboratory for testing.
>
> *As a result of its investigation, NOCSAE has concluded that these models, for
> all manufacturing dates, do not comply with the NOCSAE standard ND041
> and that the manufacturers' certifications of compliance on those helmets is
> invalid.  NOCSAE has contacted each manufacturer and advised them of its
> conclusions.*
>
> *The rules of play for lacrosse as provided by US Lacrosse, National
> Collegiate Athletic Association, National Federation of State High School
> Associations and other organizations mandate that lacrosse helmets meet the
> NOCSAE standard.  NOCSAE has advised them of its conclusions and
> anticipates that each organization will notify its members of this decision.*
> (Emphasis added).

29.     NOCSAE posted a "Frequently Asked Questions" about its voiding of the

certifications on its website.  NOCSAE provides a fuller explanation of its rationale for this

unprecedented move:

> ***Was NOCSAE's recent decision based on information from a competitor?***
>
> NOCSAE's decision to void certification of the Warrior Regulator and Cascade
> R helmet models was based solely on data developed from its own independent
> investigation and included confidential data that was not available to any
> competitor.  The decision to begin an investigation into these two models was

8

prompted by third-party laboratory test results obtained by Schutt/STX and sent simultaneously to NOCSAE and the national governing bodies on September 22, 2014. The decision to decertify the Warrior Regulator and the Cascade R was based upon a detailed review of the QC [quality control] internal certification test data provided by each company as well as laboratory tests conducted by the NOCSAE technical director at SIRC laboratories.

### *What did your investigation include?*

Initially, we demanded that Schutt/STX, Warrior, and Cascade produce to us all internal QC certification protocols and test data for evaluation for the helmet models in question. The laboratory test reports which had been part of the Schutt/STX documents included test data on the Schutt/STX helmet, so we included them within the scope of our request for this type of data. At the same time, we instructed the NOCSAE technical director to purchase units of the helmet models with failing test reports from independent retail sources and to begin testing them thoroughly.

### *What did your investigation reveal?*

A review of the QC internal testing data and statistical analysis from Schutt/STX revealed no issues, and the data supported their certification of the Stallion model. The data from Cascade and Warrior did not support certification of those models. *Since the only evidence of model failures were in the Regulator and R models, we began independent testing of those models. The helmet testing by our technical director revealed that each of these models failed by significant margins in specific impact locations, although each model failed in different areas. Both models also showed evidence of significant failures during the high-temperature testing. Our analysis of the internal QC testing data also showed consistently high test scores in the same locations where we recorded failures, as well as significant variability in scores from unit to unit. The data produced also revealed that neither company recorded any internal high-temperature testing of these two models. There were other procedural and process issues discovered as well.*

### *Why is performing high-temperature testing important?*

*The high-temperature test required by the NOCSAE standard involves impacting lacrosse helmets after they have been conditioned at 100° for more than four hours. We believe this test represents the temperature conditions under which a lacrosse helmet is most likely to perform. This part of our standard is very demanding because the standard also requires that the impact locations for the high-temperature testing must be the two impact locations that demonstrated the weakest portions of the helmet during the ambient temperature tests.*

*What should I do if I am scheduled to play in a lacrosse game soon and only have available to me a Warrior Regulator or a Cascade R helmet?*

*Because NOCSAE has no authority to require a recall, it cannot compel the manufacturer to physically remove these products from the market. But because the rules of play that govern lacrosse require that helmets meet the NOCSAE standard, voiding the certification effectively precludes the helmets from being used. Whether replacement models or modifications will be available is a question that must be directed to the manufacturers.* (Emphasis added).

30.    No consumer would knowingly purchase a lacrosse helmet that does not meet the NOCSAE standard because such a helmet would be unsafe for use, and no player would be allowed to play in any sanctioned lacrosse activity with such a helmet. Yet the NOCSAE has determined that the entire manufacturing run for the Cascade R lacrosse helmet for all dates failed to meet the NOCSAE standard, despite the fact that all Cascade R lacrosse helmets bore the logo "Meets NOCSAE Standard" and Defendants at all times marketed their Cascade R lacrosse helmets as meeting the NOCSAE standard.

31.    Defendants' false representations that their Cascade R lacrosse helmets meet the NOCSAE standard led consumers to purchase these helmets, and they have been damaged thereby.

## CLASS ACTION ALLEGATIONS

32.    Plaintiff seeks to be appointed as class representative of a class composed of and defined as follows:

All persons who bought Cascade R lacrosse helmets in Connecticut and did not resell them. Excluded from the Class are the Defendants and any Judge presiding over this matter and the members of his or her immediate family. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

10

33.     This action is appropriately suited for a class action. Plaintiff is informed, believes, and thereon alleges that the Class is sufficiently numerous such that a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Connecticut purchasers of Cascade R lacrosse helmets is impractical.

34.     This action involves questions of law and fact common to the Class. In marketing the Cascade R lacrosse helmets, Defendants engaged in a systematic course of misrepresenting the products to Connecticut consumers. Such common issues of law and fact include but are not limited to:

> •       Whether the representations that Defendants' Cascade R lacrosse helmets meet the NOCSAE standard and are safe for use was and is likely to mislead consumers;

> •       Whether failing to disclose that Defendants' Cascade R lacrosse helmets do not meet the NOCSAE standard, are not safe for use, and cannot be used in any organized, sanctioned lacrosse play was and is likely to mislead consumers;

> •       Whether Defendants made false or misleading representations regarding the quality, safety, and certifiability of Cascade R lacrosse helmets;

> •       Whether Defendants represented that Defendants' Cascade R lacrosse helmets were of a particular standard or quality when they were not;

> •       Whether, as a result of Defendants' misconduct, the Class is entitled to equitable and injunctive relief;

> •       Whether the Class members obtained the benefit of their bargain in purchasing Defendants' Cascade R lacrosse helmets;

> •       Whether, as a result of Defendants' misconduct, the Class is entitled to damages.

35.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and available remedies.

36.     Plaintiff's claims are typical of the claims of members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased the Cascade R lacrosse helmet and suffered an injury-in-fact as a result of Defendants' conduct, as did all Class members.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is represented by counsel who is competent and experienced in the prosecution of consumer class action litigation.

37.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated purchasers of the Cascade R lacrosse helmets to adjudicate simultaneously their common claims in a single forum in an efficient manner, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment also will permit the adjudication of relatively small claims by many members of the Class who could not afford individually to litigate the claims pleaded in this Complaint. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**
(Violations of Connecticut's Unfair Trade Practices Act ("CUTPA"))
C.G.S.§42-110b, *et seq.*
Unfair Practices

38.     Plaintiff hereby realleges, and incorporates by reference as though set forth

12

fully herein, the allegations contained in Paragraphs 1 through 37 above.

39.     Section 42-110b(a) of the Connecticut General Statutes provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

40.     Defendants' conduct, as alleged herein, constitutes an unfair business practice because, among other things, Defendants have falsely represented that their Cascade R line of lacrosse helmets meets the all-important NOCSAE standard when they do not, and are safe for use when they are not. This false representation is prominently displayed on each and every Cascade R helmet and in Defendants' marketing, advertising, and other materials for the Cascade R helmet product line.

41.     Said practices committed by Defendants are immoral, unethical, oppressive, and/or unscrupulous.

42.     The foregoing acts and practices of Defendants constitute an unfair business practices under CUTPA, C.G.S. §42-110b(a).

43.     Defendants' conduct as alleged in this cause of action is an intentional and wanton violation of Plaintiff's rights and the rights of the members of the Class, or has been done with a reckless indifference to those rights.

44.     Pursuant to C.G.S. Section 42-110g, Plaintiff and the Class members have suffered an ascertainable loss of money or property as a result of Defendants' unfair business practice, as alleged herein. By virtue of the foregoing unfair acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured.

13

## SECOND CAUSE OF ACTION
(Violations of Connecticut's Unfair Trade Practices Act ("CUTPA"))
C.G.S.§42-110b, *et seq.*
Deceptive Practices

45.     Plaintiff hereby realleges, and incorporates by reference, as though set forth fully herein, the allegations contained in Paragraphs 1 through 44 above.

46.     Defendants' acts, practices, omissions, failures to disclose, and course of conduct with regard to the safety of their Cascade R lacrosse helmets and the failure of those lacrosse helmets to meet the NOCSAE standard, despite Defendants' contrary representations, constitute deceptive acts and practices in the conduct of a trade or commerce in violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110b(a), *et seq.*

47.     Defendants' conduct as alleged in this cause of action is an intentional and wanton violation of Plaintiff's rights and the rights of the members of the Class, or has been done with a reckless indifference to those rights.

48.     Pursuant to C.G.S. Section 42-110g, Plaintiff and the Class members have suffered an ascertainable loss of money or property as a result of Defendants' deceptive acts or practices, as alleged herein. By virtue of the foregoing acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured.

49.     By reason of the foregoing, Defendants have violated CUTPA and are liable to Plaintiff and the Class for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus punitive damages, and attorneys' fees and costs. Plaintiff further demands injunctive relief enjoining Defendants from continuing to engage in, use, or employ any act, including advertisements, packaging, or

14

other representations, prohibited by CUTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1.      Certifying this action as a class action as soon as practicable, with a Class as defined above, designating Plaintiff as the named class representative, and designating the undersigned as Class Counsel;

2.      On Plaintiff's First and Second Causes of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus punitive damages, statutory damages, and attorneys' fees and costs;

3.      Awarding Plaintiff and the Class interest, costs, and attorneys' fees;

4.      Enjoining Defendants from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by CUTPA; and

5.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

15

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by on

all issues so triable.

Dated: White Plains, New York
      December 9, 2014

                           DENLEA & CARTON LLP
                           One North Broadway
                           Suite 509
                           White Plains, N.Y. 10601
                           Telephone: (914) 920-7400
                           Facsimile: (914) 761-1900
                           jcarton@denleacarton.com
                           rberg@denleacarton.com