UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| LINDSAY HELD and MATTHEW HEMBERGER<br>on behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>PERFORMANCE LACROSSE GROUP INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 3:14-cv-01842-WIG<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

_____

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, Lindsay Held and Matthew Hemberger ("Plaintiffs"), by and through their counsel respectfully file this Class Action Complaint on behalf of themselves and a class of similarly-situated individuals who have purchased Cascade R lacrosse helmets manufactured and/or marketed by Defendant Performance Lacrosse Group Inc. ("Performance"), and allege as follows:

## PARTIES

1.     Plaintiff Lindsay Held is a natural person of full age of majority who is domiciled and resides in Ridgefield, Connecticut, which is located in Fairfield County.  On or about June 25, 2014, Plaintiff purchased a Cascade R lacrosse helmet with a chrome mask manufactured, marketed, and distributed by Defendant, at Lacrosse Unlimited in Danbury, Connecticut. Plaintiff paid $259.99 plus applicable sales tax, and was damaged thereby.

2.     Plaintiff Matthew Hemberger is a natural person of full age of majority who is domiciled and resides in Spring City, Pennsylvania. Plaintiff Hemberger purchased the Cascade

Model R helmet for his son's personal use in organized lacrosse activities.  Plaintiff Hemberger purchased the Cascade Model R helmet for his son based on Defendant's representations that the Cascade Model R helmet provided superior impact protection and met NOCSAE's certification safety standards, a requirement of all helmets worn in Plaintiff's son's lacrosse activities. Shortly after Cascade's November 24, 2014 announcement, Plaintiff was informed that the Cascade Model R helmet he had purchased was no longer permitted to be used in Plaintiff's son's lacrosse activities because the helmet's NOCSAE certification had been voided.

3.      Performance Lacrosse Group Inc. is a wholly-owned subsidiary of Performance Sports Group Ltd.  Performance Lacrosse Group Inc. is a Delaware corporation with its principal place of business located at 100 Domain Drive, Exeter, New Hampshire.

4.      Cascade is a brand name owned by Performance Lacrosse Group Inc. Performance Lacrosse Group Inc., among other things, manufactures, distributes, and sells lacrosse helmets, including the Cascade R lacrosse helmets.

5.      According to its November 2014 Investor Presentation, Performance Sports Group believes that the U.S. and Canadian market for lacrosse equipment in 2013 amounted to $120 million in revenues, and Performance Sports Group believes that its Cascade and Maverik lacrosse equipment product sales constitute approximately a 26% market share. More importantly, Performance Sports Group believes that its lacrosse helmet products hold an approximately 85% market share.

6.      Performance's virtual "lockhold" on the lacrosse helmet market in the United States and Canada comes from sales and distribution of its Cascade lacrosse helmet products.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Jurisdiction is proper because (1) the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs and (2) the named Plaintiffs and the Defendant are citizens of different states. 28 U.S.C. §1332(d)(2)(A).

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claim occurred within this judicial district, Defendant has marketed and sold the products at issue in this action within this judicial district, and Defendant has conducted business within this judicial district.

## GENERAL ALLEGATIONS

9.      Lacrosse is a popular and growing sport in the United States and Canada. According to the New York Times, lacrosse is among the nation's fastest-growing youth sports, especially among boys whose parents are looking for a safer alternative to football.  In the 2013-2014 academic year, 188,689 boys and girls played lacrosse at the high school level, according to the National Federation of State High School Associations.

10.      With the increasing popularity across all levels of the sport, sales of lacrosse-related goods has become a lucrative business for sporting goods manufacturers. According to the Sports and Fitness Industry Association, sales of lacrosse equipment has increased from $59 million in 2008 two $89 million in 2013.

11.      Lacrosse is an aggressive contact sport, and players wear protective gear, including, most importantly, helmets.  Similar to football players, lacrosse players wear helmets to reduce the number of skull fractures and other head injuries.

12.     Improvements to sports helmets intensified in the 1960s when helmet makers improved their football helmets to reduce the number of skull fractures.  In 1969, a year after 32 deaths were reported from head and neck injuries directly due to participation in organized football games, the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") was established in order to find ways to reduce injuries.  Football helmets were targeted for the initial research effort, and the NOCSAE eventually developed manufacturing standards for football helmets, and later, for lacrosse helmets.

13.     NOCSAE is an independent and non-profit standards development body with its sole mission to enhance athletic safety through funding scientific research and by developing and maintaining performance standards for protective equipment.  NOCSAE directors represent all interests that would be materially affected by its standards, including coaches, certified athletic trainers, team physicians, equipment managers, orthopaedic and neurological sports medicine physicians, helmet reconditioners, and manufacturers.

14.     NOCSAE developed and has maintained a lacrosse helmet performance standard for many years.  In order to meet the standard, a lacrosse helmet must meet rigorous impact tests specifically set forth in ND041.  In addition, the certification of an entire model population must be premised upon an effective and properly applied quality control and quality assurance program that includes testing a statistically large enough sample of randomly selected helmets and providing a method to analyze the sample test data to prove that all helmets in the model population would meet the standard if tested.

15.     *NOCSAE does not approve or certify equipment.  But NOCSAE does take action when it determines that equipment does not in fact meet the NOCSAE standards as certified by the manufacturer.*  Significantly, the certification that a helmet meets the NOCSAE standard is

made by the *manufacturer*.  The words on the certification logo on the helmet state:

"Manufacturer certifies MEETS NOCSAE STANDARD," followed by a clearly visible helmet

logo.  Permission to use NOCSAE trademarked phrases and logos on properly certified

equipment is given to the manufacturer through a licensing agreement that obligates the

manufacturer to comply fully with all applicable NOCSAE standards and to provide proof of

proper certification when requested.

16.     A manufacturer that chooses to certify a helmet to the NOCSAE standard can

only do so if it signs a license agreement, and agrees to comply with all requirements of the

NOCSAE standards.  These requirements include, but are not limited to:

- Creating and maintaining an effective quality assurance/quality control program;

- Conducting ongoing certification testing of sample sets representing production batches or lots;

- Developing supportive statistical and quantitative data from internal quality control testing of representative samples;

- Submitting samples of certified products annually to independent and qualified test laboratories for validation;

- Regularly reporting to NOCSAE any changes to models or the addition of new models being certified; and

- Keeping all certification test records and data and making that data available to NOCSAE when requested.

17.     The rules of lacrosse govern the administration and conduct of games, including

helmets and other equipment used in the game. Three organizations write rules for lacrosse

played in the United States: United States Lacrosse ("USL"), founded in 1998, is the national

governing body of lacrosse, and sets forth youth rules for boys and girls, high school rules for

girls, non-varsity collegiate rules for women, and post-collegiate rules for men and women; the

NFHS sets forth rules for high school boys; and the National Collegiate Athletic Association ("NCAA") sets forth varsity collegiate rules for men and women. Representatives from USL sit on rules-writing committees of the NFHS and NCAA, and the three organizations often work together on rule development and player safety.

18.     Consumers and athletic organizations rely upon the NOCSAE certification when they buy helmets, and in particular, lacrosse helmets.

19.     Each of these organizations looks to NOCSAE for minimum safety standards for lacrosse helmets used in play. The rules mandate that all helmets used in play must be NOCSAE certified or otherwise meet the applicable NOCSAE standards for lacrosse helmets.

20.     Performance manufactures, distributes, and sells the leading brand of lacrosse helmets in the United States and Canada – the Cascade line of lacrosse helmets.  The Cascade line of lacrosse helmets has secured an astounding 85% of the lacrosse helmet market.

21.     Performance markets its lacrosse helmets by prominently displaying the logo "Meets NOCSAE Standard" on all its Cascade lacrosse helmets, including specifically, all models of its Cascade R lacrosse helmets.



22.     The same representation is set forth on the www.cascadehelmets.com website which Defendant maintains and utilizes to market their goods.  Each product webpage for the Cascade line of lacrosse helmets prominently displays the logo "Meets NOCSAE Standard." That website further touts Cascade's purported commitment to safety.  The "Who We Are" tab

states: "We are American innovators with a passion to protect.  We build & deliver high

performance game changing headgear.  User-experience is how we measure ourselves."

23.    Defendant further states, in the "Who We Are" tab:

>    Because Bill's vision for Cascade has always been focused around
>    the product, and Cascade strives to be on the leading edge of
>    design and safety; we have and always will devote substantial
>    resources to research and development.  These resources come not
>    only in the form of our top notch design team, but also in the
>    NOCSAE test lab which we have on site in our Liverpool
>    headquarters.  The NOCSAE test facility allows us to ensure that
>    all of our products meet and exceed the standards set by the agency
>    charged with overseeing helmet design and safety standards.

24.    Defendant's representations that their Cascade lacrosse helmets meet the

NOCSAE standard are critical to their ability to sell the Cascade lacrosse helmets.  Under

NCAA, National Federation of State High School Associations, and U.S. Lacrosse rules, helmets

are required to meet the NOCSAE standard in order to be used in their programs.  Thus, no

consumer would knowingly purchase a lacrosse helmet that does not meet the NOCSAE

standard.

25.     On or about November 20, 2014, NOCSAE took the unprecedented step of

voiding the NOCSAE certifications of two leading lacrosse helmet models, the Cascade R and

the Warrior Regulator – after an independent investigation and evaluation revealed that those

products failed to meet NOCSAE standards.  According to NOCSAE Executive Director and

General Counsel Mike Oliver, this is a first-of-its-kind but necessary decision.

26.    On or about November 24, 2014, NOCSAE issued a press release announcing that

it has voided the manufacturers' NOCSAE certification for the Warrior Regulator and the

Cascade Model R lacrosse helmets.  The press release emphasizes:

>    A product manufacturer certifies compliance with NOCSAE
>    standards when it puts the NOCSAE name and logo on a helmet.

The certification tells the player, parent, coach and the governing bodies that the helmet has been subjected to all of the required testing, quality control and quality assurance obligations specified by the NOCSAE standard. The manufacturer must confirm that its helmet meets the standard in all respects.

The Warrior Regulator and the Cascade Model R had been certified by the manufacturers as compliant with the NOCSAE standard. NOCSAE conducted an independent investigation and evaluation of the Warrior Regulator and the Cascade Model R, which included a review of each manufacturer's internal certification testing and quality control data. NOCSAE also purchased these models independently through various retail sources and sent them to its contracted laboratory for testing.

*As a result of its investigation, NOCSAE has concluded that these models, for all manufacturing dates, do not comply with the NOCSAE standard ND041 and that the manufacturers' certifications of compliance on those helmets is invalid. NOCSAE has contacted each manufacturer and advised them of its conclusions.*

*The rules of play for lacrosse as provided by US Lacrosse, National Collegiate Athletic Association, National Federation of State High School Associations and other organizations mandate that lacrosse helmets meet the NOCSAE standard. NOCSAE has advised them of its conclusions and anticipates that each organization will notify its members of this decision.* (Emphasis added).

27.     NOCSAE posted a "Frequently Asked Questions" about its voiding of the certifications on its website. NOCSAE provides a fuller explanation of its rationale for this unprecedented move:

*Was NOCSAE's recent decision based on information from a competitor?*

NOCSAE's decision to void certification of the Warrior Regulator and Cascade R helmet models was based solely on data developed from its own independent investigation and included confidential data that was not available to any competitor. The decision to begin an investigation into these two models was prompted by third-party laboratory test results obtained by Schutt/STX and sent simultaneously to NOCSAE and the national governing bodies on

September 22, 2014.   The decision to decertify the Warrior Regulator and the Cascade R was based upon a detailed review of the QC [quality control] internal certification test data provided by each company as well as laboratory tests conducted by the NOCSAE technical director at SIRC laboratories.

*What did your investigation include?*

Initially, we demanded that Schutt/STX, Warrior, and Cascade produce to us all internal QC certification protocols and test data for evaluation for the helmet models in question.   The laboratory test reports which had been part of the Schutt/STX documents included test data on the Schutt/STX helmet, so we included them within the scope of our request for this type of data.   At the same time, we instructed the NOCSAE technical director to purchase units of the helmet models with failing test reports from independent retail sources and to begin testing them thoroughly.

*What did your investigation reveal?*

A review of the QC internal testing data and statistical analysis from Schutt/STX revealed no issues, and the data supported their certification of the Stallion model.   The data from Cascade and Warrior did not support certification of those models.   *Since the only evidence of model failures were in the Regulator and R models, we began independent testing of those models.   The helmet testing by our technical director revealed that each of these models failed by significant margins in specific impact locations, although each model failed in different areas.   Both models also showed evidence of significant failures during the high-temperature testing.   Our analysis of the internal QC testing data also showed consistently high test scores in the same locations where we recorded failures, as well as significant variability in scores from unit to unit.   The data produced also revealed that neither company recorded any internal high-temperature testing of these two models.   There were other procedural and process issues discovered as well.*

*Why is performing high-temperature testing important?*

*The high-temperature test required by the NOCSAE standard involves impacting lacrosse helmets after they have been conditioned at 100º for more than four hours.   We believe this test represents the temperature conditions under which a lacrosse helmet is most likely to perform.   This part of our standard is very demanding because the standard also requires that the impact*

9

*locations for the high-temperature testing must be the two impact locations that demonstrated the weakest portions of the helmet during the ambient temperature tests.*

***What should I do if I am scheduled to play in a lacrosse game soon and only have available to me a Warrior Regulator or a Cascade R helmet?***

*Because NOCSAE has no authority to require a recall, it cannot compel the manufacturer to physically remove these products from the market.  But because the rules of play that govern lacrosse require that helmets meet the NOCSAE standard, voiding the certification effectively precludes the helmets from being used. Whether replacement models or modifications will be available is a question that must be directed to the manufacturers.*  (Emphasis added).

28.     No consumer would knowingly purchase a lacrosse helmet that does not meet the

NOCSAE standard because such a helmet would be unsafe for use, and no player would be

allowed to play in any sanctioned lacrosse activity with such a helmet.  Yet the NOCSAE has

determined that the entire manufacturing run for the Cascade R lacrosse helmet for all dates

failed to meet the NOCSAE standard, despite the fact that all Cascade R lacrosse helmets bore

the logo "Meets NOCSAE Standard" and Defendant at all times marketed their Cascade R

lacrosse helmets as meeting the NOCSAE standard.

29.     Defendant's false representations that their Cascade R lacrosse helmets meet the

NOCSAE standard led consumers to purchase these helmets, and they have been damaged

thereby.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs seek to be appointed as class representatives of a class composed of and

defined as follows:

All persons in the United States who purchased Cascade Model R lacrosse helmets and did not resell them. Excluded from the Class are the Defendant and any Judge presiding over this matter and the members of his or her immediate

family. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

31.     This action is appropriately suited for a class action. Plaintiffs are informed, believe, and thereon allege that the Class is sufficiently numerous such that a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of persons who bought Cascade R lacrosse helmets in the United States is impractical.

32.     This action involves questions of law and fact common to the Class. In marketing the Cascade R lacrosse helmets, Defendant engaged in a systematic course of misrepresenting the products to consumers. Such common issues of law and fact include but are not limited to:

- Whether the representations that Defendant's Cascade R lacrosse helmets meet the NOCSAE standard and are safe for use was and is likely to mislead consumers;

- Whether failing to disclose that Defendant's Cascade R lacrosse helmets do not meet the NOCSAE standard, are not safe for use, and cannot be used in any organized, sanctioned lacrosse play was and is likely to mislead consumers;

- Whether Defendant made false or misleading representations regarding the quality, safety, and certifiability of Cascade R lacrosse helmets;

- Whether Defendant represented that Defendant's Cascade R lacrosse helmets were of a particular standard or quality when they were not;

- Whether, as a result of Defendant's misconduct, the Class is entitled to equitable and injunctive relief;

- Whether the Class members obtained the benefit of their bargain in purchasing Defendant's Cascade R lacrosse helmets;

- Whether, as a result of Defendant's misconduct, the Class is entitled to damages.

33.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and available remedies.

34.     Plaintiffs' claims are typical of the claims of members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs purchased the Cascade R lacrosse helmet and suffered an injury-in-fact as a result of Defendant's conduct, as did all Class members.  Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of consumer class action litigation.

35.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated purchasers of the Cascade R lacrosse helmets to adjudicate simultaneously their common claims in a single forum in an efficient manner, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment also will permit the adjudication of relatively small claims by many members of the Class who could not afford individually to litigate the claims pleaded in this Complaint. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**

**Violations of Connecticut's Unfair Trade Practices Act ("CUTPA")**
**C.G.S.§42-110b, et seq.**
**Unfair Practices**

36.     Plaintiffs hereby reallege, and incorporate by reference as though set forth fully herein, the allegations contained in preceding Paragraphs above.

37.     Section 42-110b(a) of the Connecticut General Statutes provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

38.     Defendant's conduct, as alleged herein, constitutes an unfair business practice because, among other things, Defendant has falsely represented that their Cascade R line of lacrosse helmets meets the all-important NOCSAE standard when they do not, and are safe for use when they are not.  This false representation is prominently displayed on each and every Cascade R helmet and in Defendant's marketing, advertising, and other materials for the Cascade R helmet product line.

39.     Said practices committed by Defendant are immoral, unethical, oppressive, and/or unscrupulous.

40.     The foregoing acts and practices of Defendant constitute an unfair business practices under CUTPA, C.G.S. §42-110b(a).

41.     Defendant's conduct as alleged in this cause of action is an intentional and wanton violation of Plaintiffs' rights and the rights of the members of the Class, or has been done with a reckless indifference to those rights.

42.     Pursuant to C.G.S. Section 42-110g, Plaintiffs and the Class members have suffered an ascertainable loss of money or property as a result of Defendant's unfair business practice, as alleged herein.  By virtue of the foregoing unfair acts in the conduct of trade or commerce, Plaintiffs and the members of the Class have been substantially injured.

<u>**SECOND CAUSE OF ACTION**</u>

**Violations of Connecticut's Unfair Trade Practices Act ("CUTPA")**
**C.G.S.§42-110b,** *et seq.*
**Deceptive Practices**

43.     Plaintiffs hereby reallege, and incorporate by reference, as though set forth fully herein, the allegations contained in preceding Paragraphs above.

44.     Defendant's acts, practices, omissions, failures to disclose, and course of conduct with regard to the safety of their Cascade R lacrosse helmets and the failure of those lacrosse helmets to meet the NOCSAE standard, despite Defendant's contrary representations, constitute deceptive acts and practices in the conduct of a trade or commerce in violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110b(a), *et seq.*

45.     Defendant's conduct as alleged in this cause of action is an intentional and wanton violation of Plaintiffs' rights and the rights of the members of the Class, or has been done with a reckless indifference to those rights.

46.     Pursuant to C.G.S. Section 42-110g, Plaintiffs and the Class members have suffered an ascertainable loss of money or property as a result of Defendant's deceptive acts or practices, as alleged herein.  By virtue of the foregoing acts in the conduct of trade or commerce, Plaintiffs and the members of the Class have been substantially injured.

47.     By reason of the foregoing, Defendant has violated CUTPA and is liable to Plaintiffs and the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus punitive damages, and attorneys' fees and costs.  Plaintiffs further demand injunctive relief enjoining Defendant from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by CUTPA.

## THIRD CAUSE OF ACTION

### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law

48.     Plaintiffs hereby reallege, and incorporate by reference, as though set forth fully herein, the allegations contained in preceding Paragraphs above.

49.     The general purpose of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("UTPCPL"), is to protect the public from fraud and unfair or deceptive business practices.  The UTPCPL provides a private right of action for any person who "suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful" by the UTPCPL.  73 P.S. § 201-9.2(a).

50.     In the course of Defendant's business, they knowingly failed to disclose and actively concealed material facts and made false and misleading statements.

51.     Plaintiffs and members of the class relied upon Defendant's false and misleading representations and omissions.

52.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and the Class members have suffered and will continue to suffer actual damages.

53.     Plaintiffs, individually and on behalf of the other Class members, seeks treble damages and an award of attorneys' fees pursuant to 73 P.S. § 201-9.2(a).

## FOURTH CAUSE OF ACTION

### Violations of Other State Consumer Protection Acts

54.     Plaintiffs hereby reallege, and incorporate by reference, as though set forth fully herein, the allegations contained in preceding Paragraphs above.

55.     Defendant's deceptive representations and material omissions to Plaintiffs and the proposed Class members were, and are, unfair and deceptive acts and practices.

56.     Defendant's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

57.     Individually, Plaintiffs seek to recover under the laws of their home states of Connecticut and Pennsylvania.  At class certification, Plaintiffs will seek redress for Class members under the following consumer protection statutes:

    a.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE § 48 88 101, et seq., including § 4 88 113(f), and § 4 88 102(5);

    b.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 12606, CAL. BUS. & PROF. CODE § 12606.2, and CAL. BUS. & PROF. CODE § 17200, and CAL. CIV. CODE § 1770, et seq.;

    c.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. § 6 1 105, et seq., including § 6 1 113(1)(c) and § 6 1 102(b);

    d.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42 110b, et seq., including § 42 110(a)(3);

    e.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 DEL. CODE § 2511, et seq., including 6 DEL.

CODE § 2512;

f.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE § 28 3901, et seq., including § 28 3904;

g.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, et seq.;

h.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48 601, et seq., including § 48 602;

i.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, et seq.;

j.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714H.1, et seq.,

k.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. COM. LAW CODE § 13-101, et seq., including § 13-101(h);

l.      Defendant has engaged in unfair competition or unfair and deceptive acts or practices in violation MASS. GEN. LAWS ANN. ch. 93A.

m.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, et seq., including § 445 902(c);

n.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 325F.67, et seq., including §

17

407.010(5);

o.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, et seq.;

p.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59 1601, et seq., including § 59 1601(1);

q.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. § 358 A:1, et seq., including § 358A:1(1);

r.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 57:8 1, et seq., including § 56:8 1(d);

s.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57 12 1, et seq.;

t.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, et seq.;

u.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51 15 01, et seq., including § 51 15 01(4);

v.      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. STAT. § 201 1, et seq., including § 201 2(2);

w.      Defendant has engaged in unfair competition or unfair or deceptive acts or

practices in violation of S.D. CODE LAWS § 37 24 1, et seq., including § 37 24 1(8);

x.     Defendant has engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, et seq., including § 19.86.010(1); and

y.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, et seq.

58.     Plaintiffs and members of the Class were directly and proximately injured by Defendant's conduct and would not have paid for Defendant's Cascade R lacrosse helmets had they known at the time of sale they would be decertified by NOCSAE.

59.     As a proximate result of Defendant's misrepresentations and omissions, Plaintiffs and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

60.     Plaintiffs and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant as follows:

1.     Certifying this action as a class action as soon as practicable, with a Class as defined above, designating Plaintiffs as the named class representatives, and designating the undersigned as Class Counsel;

2.      On Plaintiffs' claims, award against Defendant the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus punitive damages, statutory damages, and attorneys' fees and costs;

3.      Awarding Plaintiffs and the Class interest, costs, and attorneys' fees;

4.      Enjoining Defendant from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by CUTPA; and

5.      Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by on all issues so triable.

Dated:      White Plains, New York
            March 28, 2016                           _____/s/ Jeffrey I. Carton_____
                                                     DENLEA & CARTON LLP
                                                     Jeffrey I. Carton
                                                     Roberg J. Berg
                                                     2 Westchester Park Drive, Suite 410
                                                     White Plains, NY 10604
                                                     Telephone:     (914) 331-0100
                                                     Facsimile:     (914) 331-0105
                                                     jcarton@denleacarton.com
                                                     rberg@denleacarton.com

                                                     CHIMICLES & TIKELLIS LLP
                                                     Nicholas E. Chimicles
                                                     Alison G. Gabe
                                                     One Haverford Centre
                                                     361 West Lancaster Avenue
                                                     Haverford, PA 19041
                                                     Telephone:     (610) 642-8500
                                                     Facsimile:     (610) 649-3633
                                                     nick@chimicles.com
                                                     agg@chimicles.com

MCCUNEWRIGHT LLP
Joseph G. Sauder
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone:    (610) 200-0580
jgs@mccunewright.com

THE MALONE FIRM, LLC
Thomas B. Malone
1650 Arch Street, Suite 1903
Philadelphia, PA 19103
Telephone:    (215) 987-5200
tmalone@themalonefirm.com

***Attorneys for the Plaintiffs
and Proposed Class***